# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP197-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent, |
| |    v. |
| | Jesse L. Herrmann, |
| |        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 353 Wis. 2d 304, 844 N.W. 2d 665)
(Ct. App. 2014 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 15, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 3, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | La Crosse |
|   JUDGE: | Ramona Gonzalez |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | PROSSER, J., ROGGENSACK, C.J., concur. (Opinion Filed.) |
| | ZIEGLER,J., ROGGENSACK, C.J., GABLEMAN, J., concur. (Opinion Filed.) |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Pamela Moorshead*, assistant state public defender, and oral argument by *Pamela Moorshead*.



For the plaintiff-respondent, the cause was argued by *Robert G. Probst*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2013AP197-CR
(L.C. No.  2011CF349)

STATE OF WISCONSIN               :        IN SUPREME COURT

**State of Wisconsin,**

     **Plaintiff-Respondent,**

  **v.**

**Jesse L. Herrmann,**

     **Defendant-Appellant-Petitioner.**

**FILED**

**JUL 15, 2015**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1  ANN WALSH BRADLEY, J.  Petitioner, Jesse Herrmann, seeks review of an unpublished decision of the court of appeals affirming his judgment of conviction and a circuit court order denying postconviction relief.[1]  The court of appeals determined that statements made by the circuit court judge at sentencing were insufficient to support a conclusion that she was biased.

---

[1] State v. Herrmann, No. 2013AP197-CR, unpublished slip op. (Wis. Ct. App. Feb. 13, 2014) (affirming order of the circuit court for La Crosse County, Ramona A. Gonzalez, Judge).

¶2 On review, Herrmann asserts that the circuit court's statements at sentencing revealed that she lacked impartiality, in violation of his due process rights. Specifically, he contends that the judge's references to her sister's death in a car accident similar to the one involved in Herrmann's case created the appearance of bias.

¶3 There is a presumption that a judge acted fairly, impartially, and without prejudice. State v. Goodson, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385. A defendant may rebut the presumption by showing that the appearance of bias reveals a great risk of actual bias. Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 885 (2009); Goodson, 320 Wis. 2d 166, ¶14; State v. Gudgeon, 2006 WI App 143, ¶23, 295 Wis. 2d 189, 720 N.W.2d 114; see also Williams-Yulee v. Florida Bar, 135 S. Ct. 1656 (2015). Such a showing constitutes a due process violation. Gudgeon, 295 Wis. 2d 189, ¶23.

¶4 We conclude that Herrmann has failed to rebut the presumption of impartiality. When the sentencing court's statements are viewed in context, they do not reveal a great risk of actual bias. Because we determine that no due process violation has been established, we affirm the court of appeals.

I

¶5 The facts in this case are undisputed. In June 2011 police were called to the scene of an automobile accident where a pickup truck had rear-ended a car stopped in the left-hand lane of a road, waiting to make a left turn. The truck hit the car with such force that it pushed the car into oncoming

2

traffic. The grill of the truck ended up in the back seat of the car. There were five passengers in the car, three in the back seat and two in the front. One died at the scene, the other four sustained serious injuries.

¶6 The driver of the truck ran from the scene into the woods toward a nearby bar. Bystanders pursued the driver and kept him there until police arrived. After their arrival, officers identified the driver as Jesse Herrmann and smelled the strong odor of alcohol emanating from him. Upon questioning, Herrmann indicated that he did not know where he was or what was happening. He further stated that he had consumed too much alcohol to be driving. Officers also observed an unopened can of beer lying on the highway and another unopened can lying on the floor of Herrmann's truck. A subsequent blood test showed that his blood alcohol concentration was 0.215.

¶7 Herrmann was arrested and charged with two counts of operating a motor vehicle while intoxicated causing injury as a second and subsequent offense, along with several repeater offenses: homicide by intoxicated use of a vehicle, two counts of injury by intoxicated use of a vehicle, hit and run resulting in death, hit and run resulting in injury, and first degree reckless endangerment. As a result of a plea agreement, the State dropped the hit and run resulting in injury charge and the reckless endangerment charge and Herrmann pled guilty to the charges that remained. The plea reduced Herrmann's maximum possible sentence from 181.5 years of imprisonment to 134 years of imprisonment.

¶8 Prior to sentencing, the circuit court ordered a pre-sentence investigation. The resulting report detailed Herrmann's prior record, including a prior offense of operating while intoxicated and possession of an open intoxicant in a vehicle. He also had a conviction for disorderly conduct which resulted from his being intoxicated, multiple convictions for bail jumping, and a conviction for conspiracy to possess with intent to distribute methamphetamine. He was one month into a five-year period of probation from his drug offense when the accident occurred. The report notes that Herrmann told his parole agent that although he was participating in substance abuse programs, he thought "it was a waste of time and money." Ultimately, the report recommended that Herrmann be sentenced to a 40 year period of confinement followed by 20 years of extended supervision.

¶9 Herrmann requested and obtained an alternative pre-sentence investigation. Focusing primarily on statements from Herrmann's family members, it recommended a sentence of 12-15 years confinement followed by 20 years of extended supervision.

¶10 At the beginning of the sentencing hearing, the judge disclosed that she lost her sister to a drunk driver in 1976. She told Herrmann "I don't believe that this will have any impact on my ability to set that aside and sentence you based upon the information presented on your case." She then asked Herrmann if he had any question about that or problems with it. He indicated that he did not and the sentencing hearing proceeded.

¶11 Several individuals spoke at the hearing. The victims, their family members, a pastor, and witnesses who were at the scene testified about the long-lasting effects the accident has had upon them and the community. Several asked for the court to impose the maximum sentence, citing the fact that Herrmann had not learned his lesson from his prior incarceration. Members of Herrmann's family and his friends spoke as well, trying to convey that he was not "a monster" and that he needed treatment.

¶12 Prior to issuing the sentence, the judge acknowledged that "there have been a lot of communications today, this morning and afternoon, about whether or not Mr. Herrmann is a monster." She then indicated that she felt "compelled to answer that" in her statement.

¶13 First, she made a statement about the problem of alcohol in our society, emphasizing that it is not limited to Mr. Herrmann:

> It is so easy to be in this community, and like [the] Pastor indicated, I, too, have been shocked by the seeming blasé faire attitude that this community has about alcohol use, because it is easy when these tragedies occur to paint the person who's behind the wheel while intoxicated to be a monster, and so we have a lot of grief and a lot of energy and a lot of community outrage, and that community outrage is aimed and directed at the person behind the wheel, and I believe that when we do that, we lose an opportunity, we lose an opportunity for raising the consciousness of the community because we are not just here because of Mr. Herrmann . . . .

5

¶14 The judge explained that although people complain about drunk driving, individuals do little to actively change behavior:

> People that get behind the wheel of a car while they have been drinking in my opinion any amount are putting themselves and this community at risk, and yet day after day, month after month our community just says, oh, well.  We complain and we talk about how we should challenge the students at the university not to continually drink to excess, how kids disappear, and how much harm alcohol is, but how many of us actively, actively seek to change the behaviors of those in our lives?  How many of us go out for that Friday fish fry and then not make any arrangements for who's going to drive the car home?

¶15 Next, she recognized factors in Mr. Herrmann's background mitigating his culpability:

> Mr. Herrmann, if you look at his history [he] was the son of an alcoholic, alcoholism was in his family, the product of a broken home, involved in our juvenile justice system as a — as a juvenile, involved in our criminal justice system as an adult.  He is a failure of what we do with children, with adolescents, and with adults who suffer and who continue to self-medicate, if we want to say as [his attorney] says, or just simply continue to use alcohol irresponsibly to the detriment of our society.  How many other young children are on the streets of our community who also like Mr. Herrmann come from situations where alcohol and the use of alcohol is a readily acceptable thing, that the overindulgence in alcohol is in many places cheered, where their 21st birthday is looked forward to not as a celebration of coming to adulthood but how many shots they can drink at the local taverns?

¶16 The judge then discussed how drunk driving affected her own life as her sister had been killed by a drunk driver:

> In 1976 five young women got into a vehicle, and only one of them survived. The two gentlemen in the other vehicle were 17, drunk out of their minds, and they

6

did not survive.  That was my personal story, and I will tell you that a day does not go by that I do not think of that personal tragedy, and I wish that I could tell these victims that that pain will one day disappear, but it doesn't.  Time makes it less. We redirect ourselves to other things, and a day does go by when we don't think of our loved ones and then we feel guilty at night because that happened, but life does go on, and I am very grateful today that I'm looking at four lovely young ladies and that only one family has to go through the pain that my family and the other three young ladies' families had to endure in 1976.

¶17  She further explained that although she understood the pain the families and victims were suffering, she knew from experience that no matter what sentence she gave Mr. Herrmann, it would not alleviate that pain:

And so perhaps it is again destiny or a higher power or, Pastor, probably the prayers of many others that bring me to be the judge on this particular case because I probably more than anyone else who would be able to sit on this bench in this county understand the pain that these victims are feeling, but I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay, but that nothing I do to him will lessen that pain, and that if I don't do more than just incarcerate Mr. Herrmann, if I don't speak out on behalf of my community today, then this tragedy will continue to happen on our streets, and more families will suffer the way these families suffer today.

¶18  She again emphasized that the accident should not be viewed as Mr. Herrmann simply being a monster, rather it is indicative of a greater problem that our society has with drinking and driving:

So, Mr. Herrmann, you're going to prison today, but that's just part of the story.  I want to make sure that the story is not about what a monster Jesse Herrmann was and is so that we can then wrap up this

7

little episode in a nice neat little box and all go about our business as usual, that Mr. Herrmann the monster is off the streets, and we don't have to worry about this again, because no matter what I do to Mr. Herrmann, unless this community begins to take a different attitude about drinking and driving, and I'm talking about a different attitude, not paying lip service, but actually doing, we will see this tragedy happen again and again.

¶19 The judge next reviewed Herrmann's character and his poor choices leading up to the accident. In particular, she discussed Herrmann's recent release from federal prison, reliance on alcohol, resistance to treatment, and Herrmann's reported attitude with authority. Additionally, the judge looked at the gravity of the offense and gave consideration to the number of witnesses who testified to the effects that Herrmann's crime had and continue to have on them. As mitigating factors, the judge considered Herrmann's guilty plea, age, and the fact that he has a family.

¶20 Weighing all these factors, the court imposed consecutive sentences on the various counts totaling 31 years initial confinement followed by 40 years of extended supervision. In addition, the court imposed and stayed a consecutive sentence of 20 years of confinement for the charge of hit and run resulting in death, and ordered 15 years of probation.

¶21 Herrmann filed a postconviction motion seeking resentencing by a different judge. He asserted that the circuit court described a personal experience that reflected an objective bias in sentencing and that the court's emotional

8

involvement in the crime amounted to an improper factor on which the sentence was based. The circuit court denied the motion, explaining that Herrmann took her remarks out of context.

¶22 On appeal, Herrmann again argued that the circuit court's statements at sentencing supported a conclusion that the judge was biased. The court of appeals disagreed. State v. Herrmann, No. 2013AP197-CR, unpublished slip op. (Wis. Ct. App. Feb. 13, 2014). The court observed that it is not uncommon for circuit court judges to have been personally victimized by the types of crimes that are before them. Id., ¶9. In this case, the judge's statements merely reflected that she understood the crime's effect on the victims. Id., ¶10. Viewing the sentencing as a whole, the court of appeals determined that a reasonable person would not conclude that the judge was biased. Id.

II

¶23 We are asked to determine whether the circuit court judge's statements at sentencing establish that she was objectively biased in violation of Herrmann's due process rights. "Whether a judge was objectively not impartial is a question of law that we review independently." State v. Pirtle, 2011 WI App 89, ¶34, 334 Wis. 2d 211, 799 N.W.2d 492; see also Goodson, 320 Wis. 2d 166, ¶7 ("Whether a circuit court's partiality can be questioned is a matter of law that we review independently.").

¶24 There is a presumption that a judge has acted fairly, impartially, and without prejudice. Goodson, 320 Wis. 2d 166,

9

¶8; State v. McBride, 187 Wis. 2d 409, 414, 523 N.W.2d 106 (Ct. App. 1994). The presumption is rebuttable, placing the burden on the party asserting the bias to show that bias by a preponderance of the evidence. State v. Gudgeon, 295 Wis. 2d 189, ¶20; McBride, 187 Wis. 2d at 415.

III

¶25 "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" Caperton, 556 U.S. at 876 (quoting In re Murchison, 349 U.S. 133, 136 (1955)); see also Guthrie v. WERC, 111 Wis. 2d 447, 454, 331 N.W.2d 331 (1983) ("It is, of course, undisputable that a minimal rudiment of due process is a fair and impartial decisionmaker."). Thus, a biased decisionmaker is "constitutionally unacceptable." Withrow v. Larkin, 421 U.S. 35, 47 (1975). As the court of appeals has acknowledged, "[t]he right to an impartial judge is fundamental to our notion of due process." Goodson, 320 Wis. 2d 166, ¶8.

¶26 In determining whether a defendant's due process right to trial by an impartial and unbiased judge has been violated, Wisconsin courts have taken both subjective and objective approaches; "[t]he court applie[s] a subjective test based on the judge's own determination of his or her impartiality and an objective test based on whether impartiality can reasonably be questioned." State v. Rochelt, 165 Wis. 2d 373, 378, 477 N.W.2d 659 (Ct. App. 1991). It is the application of the objective test which is at issue in this case.

10

¶27 Under the objective approach, courts have traditionally considered whether "there are objective facts demonstrating . . . the trial judge in fact treated [the defendant] unfairly." Goodson, 320 Wis. 2d 166, ¶9 (quoting McBride, 187 Wis. 2d at 416). In other words, they inquire into whether a reasonable person could conclude that the trial judge failed to give the defendant a fair trial.

¶28 This approach is illustrated by State v. Rochelt, 165 Wis. 2d 373. In that case, the defense discovered a letter from the circuit court judge in the prosecutor's file which had been sent to instructors at Police Training Services, requesting that certain officers be released from classes to testify at trial. Id. at 377-78. The letter described the officers as "'two individuals, with clean, impeccable records, and with nothing to gain or lose by their testimony,' suggesting possible prejudgment of their credibility." Id. at 379.

¶29 The circuit court denied the defendant's recusal motion and the court of appeals affirmed. It agreed that the judge's letter raised questions about his impartiality. However, in assessing whether there was actual bias, the court determined that nothing in the record tended to show that the judge had failed to give the defendant a fair trial. Id. at 381. It referenced the fact that the defendant had given no examples of unfairness. Id. Accordingly, it "conclude[d] that even though the trial judge's letter raise[d] a reasonable question regarding the judge's impartiality, the fact is that [the defendant] received a fair trial." Id.

11

¶30 Courts have since recognized that the right to an impartial decisionmaker stretches beyond the absence of actual bias to encompass the appearance of bias as well. In Gudgeon, 295 Wis. 2d 189, the court of appeals considered the situation where a judge had declined a probation agent's request to convert the defendant's restitution obligations into a civil judgment in a short note stating "No—I want his probation extended." Id., ¶3. At a subsequent extension hearing, the judge extended the defendant's probation. The defendant alleged that the note showed the judge was biased in favor of a particular result before listening to the evidence. Id., ¶1.

¶31 In setting forth the test for objective bias, the Gudgeon court acknowledged that it was difficult to discern from prior cases whether actual bias was necessary to show a due process violation, or merely one method that was sufficient to make the showing. Id., ¶22. It observed that federal precedent suggested that even the appearance of partiality can violate due process:

> "[E]very procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." Tumey v. Ohio, 273 U.S. 510, 532 (1927). Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954).

12

Id., ¶21 (quoting In re Murchison, 349 U.S. at 136). The Gudgeon court recognized that the seemingly divergent cases shared a common theme: the appearance of partiality violated due process "only where the apparent bias revealed a great risk of actual bias." Id., ¶23.

¶32 Ultimately, the Gudgeon court found the federal jurisprudence persuasive. Incorporating Murchinson's language, it concluded that "the appearance of bias offends constitutional due process principles whenever a reasonable person——taking into consideration human psychological tendencies and weaknesses—— concludes that the average judge could not be trusted to 'hold the balance nice, clear and true' under all the circumstances." Id., ¶24.

¶33 The court of appeals later repeated this test in Goodson, 320 Wis. 2d 166, ¶9. In that case, a judge told a defendant during sentencing that if he violated the rules of extended supervision "you will come back here, and you will be given the maximum, period." Id., ¶2. Later, at a reconfinement hearing after the defendant's supervision was revoked, the judge ordered the defendant reconfined for the maximum period. Id., ¶5. Applying its test for objective bias, the court of appeals determined the defendant's due process rights were violated because a reasonable person would conclude "that the judge had made up his mind about [the defendant's] sentence before the reconfinement hearing." Id., ¶13.

¶34 Similarly, in Caperton, 556 U.S. 868, the United States Supreme Court reaffirmed its position that actual bias

13

need not be shown to establish a violation of a party's right to a fair tribunal. In that case, the Court considered whether the petitioner's due process rights were violated when one of the West Virginia Supreme Court justices refused to recuse himself after receiving large campaign contributions from the respondent corporation's chief executive officer.

¶35 After observing the difficulties in discerning the real motives at work in deciding a case, the Court announced that "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias." Id. at 883. "Due process 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" Id. at 886 (quoting Murchinson, 349 U.S. at 136). Like the court of appeals in Gudgeon, the Court focused on whether there was a serious risk of actual bias.[2]

¶36 Its inquiry into whether there was a serious risk of actual bias centered on the circumstances of the case, which the Court referred to as exceptional. Id. at 884. The Court acknowledged the large size of the contributions in comparison to the total amount of money contributed to the campaign, the

---

[2] The court of appeals refers to a "great" risk of actual bias, State v. Gudgeon, 2006 WI App 143, ¶23, 295 Wis. 2d 189, 720 N.W.2d 114, and the United States Supreme Court refers to a "serious" risk of actual bias, Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 884 (2009). Although stated differently, the tests appear to be essentially the same.

total amount spent in the election, and the apparent effect such contributions had on the outcome of the election. It further observed the close temporal relationship between the campaign contributions, the justice's election, and the pendency of the case. Id. at 886. Under these circumstances, the Court concluded that "there is a serious risk of actual bias——based on objective and reasonable perceptions——when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case . . . ." Id. at 884.

¶37 Admittedly, the Supreme Court was careful to limit its analysis. Although it ultimately concluded that the appearance of bias that it was reviewing violated due process, the Court described this as "an extraordinary situation where the Constitution requires recusal." Id. at 887. Like the Gudgeon court, it observed that its prior cases requiring recusal "dealt with extreme facts that created an unconstitutional probability of bias." Id.

¶38 However, in determining that there was a serious risk of actual bias the Court provided a test that can apply to a multitude of scenarios: "Due process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." Id. at 885. It embraced that framework in its conclusion: "We find that Blakenship's significant and disproportionate influence——coupled with the

15

temporal relationship between the election and the pending case——'offer a possible temptation to the average judge to . . . lead him not to hold the balance nice, clear and true.'"  Id. at 886.

¶39  More recently, the Supreme Court reaffirmed that there is a "'vital state interest' in safeguarding 'public confidence in the fairness and integrity in the nation's elected judges.'"  Williams-Yulee, 135 S. Ct. at 1666 (quoting Caperton, 556 U.S. at 889).   It acknowledged that "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record."  Id. at 1667.  Nevertheless, "justice must satisfy the appearance of justice."  Id. at 1666 (quoting Offutt, 348 U.S. at 14).   There is a compelling interest in avoiding "possible temptation[s] . . . 'which might lead [a judge] not to hold the balance, nice, clear and true.'"  Id. (quoting Tumey, 273 U.S. at 532).

¶40  We acknowledge the concerns raised by Caperton and Williams-Yulee.  A fundamental principle of our democracy is that judges must be perceived as beyond price.  Likewise, we recognize that the precedent established by the United States Supreme Court and our court of appeals provides that in limited situations the appearance of bias can offend due process. Specifically, the appearance of bias violates due process when there is "a great risk of actual bias."  Gudgeon, 295 Wis. 2d 189, ¶23; see also Caperton, 556 U.S. at 884 (considering whether there is "a serious risk of actual bias").

16

¶41 Lest there be any confusion engendered by the separate writings below, Caperton addressed recusal in the context of the appearance of bias. Relying on a case that originated in Wisconsin, Caperton specifically announced that it was not addressing whether there was actual bias.:

> We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias . . .

> [T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias. In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

Id. at 883-84 (quoting Withrow v. Larkin, 421 U.S. at 47). It explained that due process may require recusal even when actual bias is not present:

> Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties."

Id. at 886 (quoting Murchison, 349 U.S. at 136).

¶42 As evidenced by the separate writings, this court has a difficult relationship with the issue of recusal and its controlling precedent in the context of the appearance of bias.[3]

---

[3] This difficult relationship with the issue of judicial recusal appears not only in our opinions but also in our administrative function of rule making.

(continued)

17

In 2009 a majority of this court adopted verbatim the petition of Wisconsin Manufacturers & Commerce and the Wisconsin Relators that amended Wisconsin's rules of judicial conduct with regard to judicial recusal as it relates to judicial campaigns. In the matter of amendment of the Code of Judicial Conduct's rules on recusal; in the matter of amendment of Wis. Stat. § 757.19. S. Ct. Order 08-16, 08-25, 09-10 & 09-11, 2010 WI 73 (issued July 7, 2010, eff. July 7, 2010) (Bradley, J., dissenting, joined by Abrahamson, C.J., and Crooks, J.).   In response, the Brennan Center for Justice, a non-partisan public policy and law institute at the New York University School of Law, observed that the majority's newly amended recusal rule "violated the spirit——if not the very letter" of Caperton. Jonathan Blitzer, Vanishing Recusal Prospects in Wisconsin, Brennan Center for Justice (Jan. 26, 2010).   It expressed additional concern that the recusal rules were "a serious blow to the integrity of the Court." Id.

A similar concern that the majority's newly amended recusal rules subverted the integrity of the court was widely disseminated in editorials across the state:

- Milwaukee Journal Sentinel: "A breach in reality.   In a 4-3 vote, justices thumb their noses at the perception of connections between large campaign contributions and the court's integrity, objectivity and credibility." (Oct. 29, 2009)

- Appleton Post-Crescent: "Supreme Court rule robs public trust." (Nov. 1, 2009)

- Green Bay Press Gazette: "Big Money always finds a loophole." (Nov. 5, 2009)

- Eau Claire Leader Telegram: "High Court in session; bring your wallet." (Nov. 1, 2009)

- Racine Journal Times: "Supreme Court recusal rule is disgrace to state." (Nov. 2, 2009)

- Sheboygan Press: "Is justice for sale in Wisconsin?" (Nov. 2, 2009)

- Oshkosh Northwestern: "Supreme Court fails to clean blemished image." (Oct. 30, 2009).

(continued)

¶43 The concurrence of Justice Ziegler discusses Caperton at length, so severely cabining its reach that it appears to apply only during a "perfect storm" in West Virginia. Justice Ziegler's concurrence, ¶138. Taking a different approach, the concurrence of Justice Prosser acknowledges that it is uncomfortable with controlling precedent stating "[c]learly, this writer is uncomfortable with the decisions in Gudgeon and Goodson." Justice Prosser's concurrence, ¶102. It takes to task both District Two and District Three of the court of appeals by asserting several inadequacies in the Gudgeon and Goodson opinions, including that they are not forthright in disclosing all the facts of the cases. Id.

¶44 This court has previously and extensively analyzed and re-analyzed the issue of judicial recusal in the context of the appearance of bias. See, for example, State v. Allen, 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863, where our writings covered 128 pages of the Wisconsin Reports. See also Ozanne v. Fitzgerald, 2012 WI 82, 342 Wis. 2d 396, 822 N.W.2d 67; State v. Henley, 2011 WI 67, 338 Wis. 2d 610, 802 N.W.2d 175.

In sidestepping the directive of Caperton, some on the court announced a heretofore unknown premise—never previously enunciated and not since embraced in the annals of this country's jurisprudence on judicial recusal. They advanced that the public's right to vote (which the justices found in the First Amendment of the United States Constitution) justified their lack of adherence to Caperton and its due process considerations. In the matter of amendment of the Code of Judicial Conduct's rules on recusal; in the matter of amendment of Wis. Stat. § 757.19, S. Ct. Order 08-16, 08-25, 09-10 & 09-11, 2010 WI 73 (Roggensack, J., separate writing).

¶45 The separate writings today appear to continue that discussion, but add little additional insight or argument. Rather than re-engage in the debate at length here and skew the focus of this opinion, the reader is instead referred to our prior lengthy discussion of the issue in the cases cited above.

¶46 In sum, when determining whether a defendant's right to an objectively impartial decisionmaker has been violated we consider the appearance of bias in addition to actual bias. When the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted, and a due process violation occurs. Caperton, 556 U.S. at 885; Goodson, 320 Wis. 2d 166, ¶9; Gudgeon, 295 Wis. 2d 189, ¶¶21, 24.

¶47 We turn next to apply this test to the facts of this case.

IV

¶48 Herrmann contends that the circuit court judge's statements about her sister could cause a reasonable person to question her impartiality. Specifically, he points to the judge's statement about her sister's car accident during the sentencing hearing:

> In 1976 five young women got into a vehicle, and only one of them survived. The two gentlemen in the other vehicle were 17, drunk out of their minds, and they did not survive. That was my personal story, and I will tell you that a day does not go by that I do not think of that personal tragedy, and I wish that I could tell these victims that that pain will one day disappear, but it doesn't. Time makes it less. We redirect ourselves to other things, and a day does go by when we don't think of our loved ones and then we feel guilty at night because that happened, but life

20

does go on, and I am very grateful today that I'm looking at four lovely young ladies and that only one family has to go through the pain that my family and the other three young ladies' families had to endure in 1976.

¶49 He also points to the judge's statement about understanding the pain the families and the victims were suffering:

> And so perhaps it is again destiny or a higher power or, Pastor, probably the prayers of many others that bring me to be the judge on this particular case because I probably more than anyone else who would be able to sit on this bench in this county understand the pain that these victims are feeling, but I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay, but that nothing I do to him will lessen that pain, and that if I don't do more than just incarcerate Mr. Herrmann, if I don't speak out on behalf of my community today, then this tragedy will continue to happen on our streets, and more families will suffer the way these families suffer today.

Like the circuit court and the court of appeals, we conclude that, when viewed in context, a reasonable person would not question the court's partiality based on these statements.

¶50 In this case there was a lengthy sentencing hearing. Twenty individuals testified before the judge issued the sentence, including each of the four surviving victims. The first victim to testify spoke about the loss of her friend in the accident and the trouble she was having coping with that loss, in addition to her own injuries. The next victim testified about how Herrmann chose to drink and how selfish it was for him to run away after the crash. She requested that the court hold him accountable. These sentiments were repeated by

21

the third victim, who likewise criticized Herrmann for running away. The last victim to testify focused on how long it was taking for them to recover, and how much their friend will be missed.

¶51 The victims' testimony was followed by testimony from their families. Several individuals spoke about how beloved the deceased victim had been and how devastating the injuries were to the surviving victims. They requested that the court not allow Herrmann the opportunity to ever drive drunk again or to make similar poor decisions in the future. They stressed that he had chosen to drink and chosen to drive. They requested that justice be done and stated that in this case, there was no reason to impose anything but the maximum sentence.

¶52 A pastor from the community also spoke. He asked the court "to make a clear statement that we will not tolerate the abuse of alcohol, that we will not look with leniency upon the devastating consequences of the willful abuse of alcohol." He likewise stressed that Herrmann's actions were willful and had a devastating impact on the community. He requested that the court impose the maximum penalty.

¶53 The pastor's testimony was followed by the statement of an individual who was present at the scene. He saw Herrmann's truck smash into the car and stopped to help. He spoke about the gruesome nature of the scene and that Herrmann just ran away. Another witness's statement was read into the record. The crash occurred near his house and he ran out to help. He indicated that while he was trying to help the victims

22

and waiting for emergency responders to arrive, Herrmann appeared not to care how the victims were doing.

¶54 There were also witnesses who spoke on behalf of Herrmann. His mother expressed her sympathy for the victims and stated that this was an accident, not something Herrmann had planned. Although he was being portrayed as a monster, she explained that Herrmann was a caring son, grandson, father, brother, uncle, and friend. No amount of prison time was going to bring back the deceased or take away any of the victims' pain and suffering.

¶55 Similarly, the mother of Herrmann's son testified that he was a good father. She stressed that this was not an intentional act. One of his friends spoke about how Herrmann had assisted her when she needed help. His sister explained that he had been a good brother. His father testified that Herrmann would never intentionally harm anyone and reiterated that he was not a monster. Lastly, Herrmann's grandmother spoke. She expressed her sympathies for the victims and stated that Herrmann had been a good grandson.

¶56 It was after hearing all of these statements that the judge apparently felt compelled to answer the assertions about Herrmann being a monster. She began by acknowledging that there is a problem of drinking and driving in our society, which is not limited to Herrmann. Then, she recognized multiple factors in Herrmann's background mitigating his culpability, including the fact that there was alcoholism in his family, he came from a

23

broken home, and had been involved in the juvenile justice system.

¶57 She suggested that Herrmann's story illustrates society's failure to help children and to help adults who suffer with alcoholism. She asked "How many other young children are on the streets of our community who also like Mr. Herrmann come from situations where alcohol and the use of alcohol is a readily acceptable thing[?]"

¶58 It was at this point that the judge brought up her sister's accident, assuring the victims and their family members that she understood that such an accident is a painful tragedy. Her remarks, however, also conveyed that although she understood the pain the families and victims were suffering, no matter what sentence she gave Mr. Herrmann, it would not alleviate that pain:

> I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay, but that nothing I do to him will lessen that pain, and that if I don't do more than just incarcerate Mr. Herrmann, if I don't speak out on behalf of my community today, then this tragedy will continue to happen on our streets, and more families will suffer the way these families suffer today.

¶59 The judge then emphasized that the accident should not be viewed as Mr. Herrmann simply being a monster, rather it is indicative of a greater problem that our society has with drinking and driving:

> So, Mr. Herrmann, you're going to prison today, but that's just part of the story. I want to make sure that the story is not about what a monster Jesse Herrmann was and is so that we can then wrap up this little episode in a nice neat little box and all go

24

about our business as usual, that Mr. Herrmann the monster is off the streets, and we don't have to worry about this again, because no matter what I do to Mr. Herrmann, unless this community begins to take a different attitude about drinking and driving, and I'm talking about a different attitude, not paying lip service, but actually doing, we will see this tragedy happen again and again.

¶60 In this context, it is apparent that although the judge's statements about her sister were personal, they were used in an attempt to illustrate the seriousness of the crime and the need to deter drunk driving in our society. They do not appear as an expression of bias against Herrmann.

¶61 As the judge's statements addressed the seriousness of the crime and the need to deter drunk driving, they were consistent with the requirements placed on judges to discuss the objectives of the sentence. This court explained in State v. Gallion, 2004 WI 42, ¶40, 270 Wis. 2d 535, 678 N.W.2d 197, that "[c]ircuit courts are required to specify the objectives of the sentence on the record. These objectives include, but are not limited to, the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others." The court also identified several mitigating and aggravating factors for sentencing courts to consider.[4] Id., ¶43 n.11.

---

[4] These include:

(1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the

(continued)

¶62 Similar requirements have been incorporated into Wisconsin's statutes. Wisconsin Stat. § 973.017(2) provides:

> When a court makes a sentencing decision concerning a person convicted of a criminal offense committed on or after February 1, 2003, the court shall consider all of the following:
>
> (ad) The protection of the public.
>
> (ag) The gravity of the offense.
>
> (ak) The rehabilitative needs of the defendant.
>
> (b) Any applicable mitigating factors and any applicable aggravating factors, including the aggravating factors specified in subs. (3) to (8).

Wis. Stat. § 973.017(2) (2009-10).[5]

¶63 Here, the circuit court judge fulfilled her obligations under the statute and <u>Gallion</u>. After her statements about her sister and the serious problem society has with drinking and driving, the judge reviewed elements of Herrmann's character. She observed that he had a habit of running away when things got difficult. She discussed Herrmann's poor

---

defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention

<u>State v. Gallion</u>, 2004 WI 42, ¶43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197 (quoting <u>Harris v. State</u>, 75 Wis. 2d 513, 519-20, 250 N.W.2d 7 (1977)).

[5] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

26

choices leading up to the accident, including his choice to drink and his choice to drive.

¶64 The judge considered that Herrmann had already been given opportunities to adjust his behavior. He previously had been fined and had the benefit of alcohol and drug assessments and treatment in the community and in an institutional setting. Additionally, he previously had the benefit of supervision. Throughout it all, Herrmann resisted treatment.

¶65 Stressing the gravity of the offense, the judge noted how many witnesses testified to the effects that Herrmann's crime had and continue to have on them. Lastly, as mitigating factors, the judge considered Herrmann's guilty plea, his age, and the fact that he has a family. It was after weighing all these factors that the court imposed Herrmann's sentence of 31 years initial confinement followed by 40 years of extended supervision, a sentence less than the 40 years confinement recommended in the PSI.

¶66 The circuit court's statements were made in compliance with the requirements of Wis. Stat. § 973.017(2) and Gallion. When viewed in that context, they do not reveal a great risk of actual bias. Accordingly, we determine that Herrmann has failed to rebut the presumption of impartiality.

V

¶67 In sum, there is a presumption that a judge acted fairly, impartially, and without prejudice. Goodson, 320 Wis. 2d 166, ¶8. A defendant may rebut the presumption by showing that the appearance of bias reveals a great risk of actual bias.

27

<u>Caperton</u>, 556 U.S. at 885; <u>Goodson</u>, 320 Wis. 2d 166, ¶¶9, 14; <u>Gudgeon</u>, 295 Wis. 2d 189, ¶24, <u>see also</u> <u>Williams-Yulee</u>, 135 S. Ct. 1660. Such a showing constitutes a due process violation. <u>Gudgeon</u>, 295 Wis. 2d 189, ¶23.

¶68 We conclude that Herrmann has failed to rebut the presumption of impartiality. When the sentencing court's statements are viewed in context, they do not reveal a great risk of actual bias. Because we determine that no due process violation has been established, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶69  DAVID T. PROSSER, J.   *(concurring).*  I agree with the bottom line of the lead opinion.  On the basis of the facts set out in the lead opinion, I have no difficulty in concluding that the sentencing judge in this case was not biased against the defendant and that a reasonable person, fully apprised of the facts in the record, would not reach a different determination.

¶70  I do not join the lead opinion because it relies on three cases, State v. Gudgeon, 2006 WI App 143, 295 Wis. 2d 189, 720 N.W.2d 114; State v. Goodson, 2009 WI App 107, 320 Wis. 2d 166, 771 N.W.2d 385; and Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), that tend to confuse and undermine the administration of justice.

¶71  These cases create "objective" tests of bias that are so loose and vague that they are almost impossible for courts to apply in a fair and consistent manner.  Consequently, these tests can be manipulated by parties, manipulated by non-parties, and manipulated by judges, to achieve some desired result.  This manipulation is not law; it is gamesmanship.

¶72  Because the lead has pointed to Gudgeon, Goodson, and Caperton as prime examples of controlling authority, these cases require a closer look than they have received.

## I. STATE V. GUDGEON

¶73  State v. Gudgeon was decided by the court of appeals in 2006.  The defendant was charged on July 24, 2000, with three offenses: (1) operating a motor vehicle without owner's consent, (2) fleeing or eluding an officer, and (3) resisting or obstructing an officer.  These charges "arose from an incident

1

in which Gudgeon took off with another individual's motorcycle and attempted to flee from police." Gudgeon, 295 Wis. 2d 189, ¶2. "After Gudgeon abandoned the motorcycle in a ditch, one of the officers in pursuit accidentally ran into it. The bike was destroyed." Id.

¶74 When Gudgeon entered a plea to the first of the three offenses on August 24, 2000, as part of a plea bargain, he was given two years of probation, with six months of jail time subject to work release privileges. The six months were then stayed. This withheld sentence was designed to assist Gudgeon in paying $8,425 in restitution for the destroyed motorcycle.[1] Id.

¶75 Unfortunately, Gudgeon did not take advantage of the court's leniency. He violated the rules of probation, then stipulated to serving six months of jail time.

¶76 On May 15, 2002, Gudgeon's probation agent notified the court that Gudgeon's probation was about to expire. She advised that Gudgeon was unable to use his work release privileges because of pending charges in Kenosha County and McHenry County, Illinois. She recommended that Gudgeon's unpaid restitution be converted to a civil judgment. Id., ¶3. She gave reasons for this recommendation, namely, that a civil judgment would earn interest for the victim, while extending Gudgeon's supervision would not; and Gudgeon's supervision might be difficult if Gudgeon were convicted in Illinois. Id.

---

[1] Some of the facts outlined in this concurrence are taken from Gudgeon's 2005 brief to the court of appeals.

2

¶77 In reply, Judge Michael Gibbs——who replaced the judge who had sentenced Gudgeon because of judicial rotation—— handwrote at the bottom of the letter, "No——I want his probation extended," and he sent copies of the agent's letter "to the probation agent, the district attorney, and Gudgeon's last attorney of record." Id.

¶78 On May 30, 2002, Gudgeon's probation agent sent another letter to the court, acknowledging that the court wanted Gudgeon's probation extended but asserting that Gudgeon would not agree to a probation extension without first discussing the matter with a lawyer. Gudgeon's refusal to permit his extension by waiver meant that an extension hearing was required.

¶79 Gudgeon's refusal to waive the probation extension was noted at the August 21 extension hearing. An assistant district attorney pointed out that Gudgeon had outstanding restitution and Gudgeon admitted that he had paid only a small portion out of the required $8,425, so that he still owed $7,834.53. He also had other court costs to pay. Gudgeon explained that he had not paid more because he had spent a lot of time in custody and had not been able to work. Judge Gibbs extended Gudgeon's probation at the hearing, explaining, "The only way I can see where we can make sure you are going to pay is to keep the hammer over your head, give you an incentive to pay it. . . . Your probation is going to be extended for two years. If you pay that off, you get off supervision. The sooner you pay it off, the sooner you get off probation." Gudgeon did not appeal the extension.

¶80 The following year Gudgeon's probation was revoked because of new violations, and he was sentenced to prison. He did not appeal this sentence either.

¶81 Gudgeon's next step was to file a postconviction motion under Wis. Stat. § 974.06. "He alleged [in the motion] that his due process rights had been violated during the extension proceedings because the presiding judge was not a neutral magistrate. Gudgeon read the court's handwritten notation on the letter from his probation agent as prejudging the case with respect to whether to extend probation." Id., ¶5.

¶82 The court of appeals bought Gudgeon's argument. It assumed a sufficient reason for a collateral attack under Wis. Stat. § 974.06 because of newly discovered evidence, even though the court had sent a copy of the letter with notation to Gudgeon's last attorney and Gudgeon had obviously discussed the judge's thinking with his probation agent. The court of appeals then suggested that the circuit court had deprived Gudgeon of an impartial and unbiased tribunal and deemed this denial equivalent to deprivation of counsel——a "structural error" not subject to harmless error analysis.

¶83 In sum, although the court of appeals was unwilling to conclude that Judge Gibbs was actually biased ("We cannot conclude that the court's notation on the letter persuasively establishes actual bias in and of itself given our experience and the reputation of this particular trial judge as a fair and just administrator of the law"), it nonetheless detected the "appearance of partiality." Gudgeon, 295 Wis. 2d 189, ¶25. The court said:

4

> [T]he appearance of bias offends constitutional due process principles whenever a reasonable person——taking into consideration human psychological tendencies and weaknesses——concludes that the average judge could not be trusted to "hold the balance nice, clear and true" under all the circumstances.

Id., ¶24.

¶84 The court of appeals quoted various opinions to define the role of appellate judges. Appellate judges "determine whether 'the potential for bias is sufficiently great' to sway the average person serving as judge away from neutrality" and "due process is violated . . . [when] the risk of bias is impermissibly high." Id. The court added:

> We must resolve this case based on what a reasonable person would conclude from reading the court's notation, not what a reasonable trial judge, a reasonable appellate judge, or even a reasonable legal practitioner would conclude.

Id., ¶26.

¶85 In my view, the Gudgeon case does not provide clear guidance to Wisconsin judges. Appellate judges are supposed to determine, not as fact but as a matter of law, whether a reasonable person——taking into consideration human psychological tendencies and weaknesses——would "conclude" ("conclude" implies a legal determination) that the average judge (not the judge who is the subject of inquiry) could be trusted to make a fair decision, given certain facts. These appellate judges apparently may not consider such legal realities as the fact that judges in Walworth County frequently extended probation when a probationer failed to pay off or make good progress in paying off restitution, and the law that criminal court judges lose control of restitution when probation ends and a

5

probationer's unpaid restitution is converted to a civil judgment. See Huml v. Vlazny, 2006 WI 87, 293 Wis. 2d 169, 716 N.W.2d 807. Reasonable trial judges, reasonable appellate judges, and reasonable legal practitioners would know that circuit judges, "for cause or by order," may extend probation for a stated period, Wis. Stat. § 973.09(3)(a), especially when "The probationer has not made a good faith effort to discharge court-ordered obligations or pay fees owed under s. 304.074." Wis. Stat. § 973.09(3)(c)1.

¶86 Apparently, a "reasonable person" who is not a judge or legal practitioner may not consider this information. It is not at all clear what "the reasonable person" is supposed to consider beyond his or her psychological hunches.

¶87 The Gudgeon court said, "Although we may be convinced that the circuit court was not prejudging the extension issue, that is not the test. The risk of bias that the ordinary reasonable person would discern . . . is the test." Id., ¶30. That "risk" "is simply too great to comport with constitutional due process." Id.

¶88 The court of appeals remanded the case to the circuit court for a new probation extension hearing, saying "when a tribunal predetermines how it will rule, the error is structural and poisons the entire proceeding." Id., ¶31. This court denied the State's petition for review. When the Gudgeon case was remanded, however, Gudgeon himself waived rights to a new hearing——likely knowing that he could not establish "newly discovered evidence" or escape from another extension of his probation.

## II. STATE V. GOODSON

¶89 State v. Goodson was decided in 2009, three years after Gudgeon. The court forthrightly acknowledged that "Our decision in Gudgeon guides our conclusion." Goodson, 320 Wis. 2d 166, ¶10.

¶90 In Goodson, the defendant was convicted of five criminal offenses, including two felony counts of possession of a short-barreled firearm and fourth-degree sexual assault (reduced from second-degree sexual assault).[2] He was given a 45-month prison sentence by Outagamie County Circuit Judge Harold Froehlich. Goodson's sentence was reversed by the court of appeals on grounds that his counsel provided ineffective assistance at the sentencing hearing.

¶91 The case was remanded and assigned to Circuit Judge Mark McGinnis. At a new sentencing hearing on October 11, 2005, Judge McGinnis described Goodson's abuse of his ex-wife and daughter, noting that he had "physically, psychologically, emotionally, sexually, you raped her, verbally abused and just abused her for many years. Do I think you are dangerous? Absolutely."

¶92 Judge McGinnis added, "I am tempted to just give you the maximum today. I don't have to go along with joint recommendations . . . . I sit here and read this file over, and

---

[2] Some of the facts in this discussion are taken from Goodson's brief in the court of appeals as well as a prior unpublished court of appeals decision, State v. Goodson, No. 2004AP2913-CR, unpublished slip op. (Jul. 6, 2005).

I say why.  What did your ex-wife ever do to deserve that?  And the answer is: She didn't do anything to deserve it, period."

¶93  Judge McGinnis then imposed sentence:

> On one of the firearm counts, the court sentenced Goodson to six years' imprisonment, with three years' initial confinement and three years' extended supervision.  On the other firearm count and the sexual assault, it withheld sentence and placed Goodson on probation consecutive to the prison sentence.  On the remaining two misdemeanors, it sentenced Goodson to ninety-day jail terms, concurrent with each other but consecutive to the prison sentence.  The court announced it was structuring the sentence like this to "[hang the] maximum penalty over [Goodson] . . . ."  The court warned Goodson "[I]f you deviate one inch from these rules, and you may think I'm kidding, but I'm not, you will come back here, and you will be given the maximum, period.  Do you understand that?"  Goodson replied that he did.

Id., ¶2 (footnote omitted).

¶94  Like Judge Froehlich's sentence, Judge McGinnis's sentence resulted in 45 months of confinement, but Goodson was given 857 days of credit on the sentence because of his time in custody.  This resulted in 338 days of remaining confinement—less than a year.

¶95  When Goodson completed his confinement time, he was inadvertently reincarcerated at the Outagamie County Jail, where he was soon charged with battery by a prisoner.  Due to its mistake of taking Goodson into custody, the Department of Corrections recommended limiting reconfinement to the 113 days of time served in jail.  Judge McGinnis accepted this recommendation, giving Goodson the benefit of the doubt.  Id., ¶¶3-4.  In other words, Judge McGinnis did not give Goodson "the maximum."

8

¶96 Five months later, however, after Goodson's extended supervision was revoked for numerous violations, Judge McGinnis reconfined Goodson for the maximum period of time available——two years, eight months, and 17 days. Goodson had been arrested after he threatened a new girlfriend, and attempted to commit suicide by driving the girlfriend's truck head-on into a concrete pole, causing himself serious injury.

¶97 The circuit court's sentence seemed to shock the court of appeals: "By prejudging Goodson's reconfinement sentence, the court was objectively biased. Therefore, Goodson is entitled to a new reconfinement sentence hearing." Id., ¶1.

¶98 The court stated that Goodson's appeal "requires us to determine whether Goodson was sentenced by an impartial judge. Whether a circuit court's partiality can be questioned is a matter of law that we review independently." Id., ¶7.

¶99 The court of appeals then concluded that the circuit court was objectively biased——that is, the court gave "the appearance of bias" and the court was actually biased as well, although "Goodson concedes he cannot show the court was subjectively biased." Id., ¶8. As to the appearance of bias, the court quoted the Gudgeon passage about the reasonable person concluding that "the average judge could not be trusted." Id., ¶9 (quoting Gudgeon, 295 Wis. 2d 189, ¶24). The court added: "[T]he appearance of partiality constitutes objective bias when a reasonable person could question the court's impartiality based on the court's statements." Id., ¶9 (citing Gudgeon, 295 Wis. 2d 189, ¶26).

¶100 The court continued:

9

> We agree with Goodson that a reasonable person would interpret the court's statements to mean it made up its mind before the reconfinement hearing. . . .
>
> . . . .
>
> Here, the court unequivocally promised to sentence Goodson to the maximum period of time if he violated his supervision rules. A reasonable person would conclude that a judge would intend to keep such a promise——that the judge had made up his mind about Goodson's sentence before the reconfinement hearing. This appearance constitutes objective bias.

Id., ¶¶10, 13

¶101 The court went on to conclude that "There could not be a more explicit statement confirming that the sentence was predecided. This is definitive evidence of actual bias." Id., ¶16.

¶102 Clearly, this writer is uncomfortable with the decisions in Gudgeon and Goodson. Both courts failed to disclose all the facts. Both courts did not contend that the defendants had actually suffered unfair treatment. Both courts left open the question whether there would have been any "bias" at all if the judges had kept their thinking to themselves. The Goodson court, following Gudgeon, did not explain why the imposition of a heavy penalty in a sentence that is stayed, see, Wis. Stat. § 973.09(1)(a), would not be "prejudging" the defendant's sentence if his or her probation were revoked. The court's ruling is certainly inconsistent with the practice in drug courts.

¶103 More important, the two cases applied their ambiguous tests for bias in situations——probation extension and reconfinement sentencing——in which the stakes were not very high. One wonders whether the court of appeals would have

developed and applied the same tests if confronted with a situation where the stakes were critical, such as wiping out a homicide conviction after a four-week jury trial, even though a judge's candid statement may never have been heard by a jury trying the facts. After all, in the Gudgeon court's view, bias——and even more, the appearance of bias——may be wholly unrelated to any actual unfairness to the defendant.

### III. CAPERTON V. A.T. MASSEY COAL CO.

¶104 The Caperton case is a different animal. The facts in Caperton created the widespread impression that a single individual spent more than $3 million to elect a new supreme court justice who would overturn a $50 million jury verdict in a specific case involving the individual that was soon to come before the West Virginia Supreme Court. The United States Supreme Court's decision is completely understandable. The problem in Caperton, like the problem in Gudgeon and Goodson, is that its broad language is difficult to cabin and thus invites application in materially different fact situations.

¶105 The Caperton majority said that an appellate court's objective inquiry is "whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias,'" Caperton, 556 U.S. at 881; whether an interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden," id. at 884, whether there is "a serious risk of actual bias." Id. The Court added: "[O]bjective standards may . . . require recusal whether or not actual bias exists or can be proved." Id. at 886.

11

¶106 The Caperton Court noted that "Massey and its amici predict that various adverse consequences will follow from recognizing a constitutional violation here——ranging from a flood of recusal motions" to interference with judicial elections. Id. at 887. "We disagree." Id. The Supreme Court may have been correct in Caperton but it was not correct with respect to this latter comment, at least in Wisconsin.

¶107 The reality of contemporary life is that the appearance of bias can be created for a judge by someone other than the judge. What are judges to do in this situation? How are they supposed to assess the reasonable person's conclusions if the reasonable person is basing his conclusions on misleading information?

¶108 My concern with the lead opinion is its veneration of the "appearance of bias" standard without providing any additional guidance as to when or how to apply this imprecise standard. The lead opinion's discussion of the "appearance of bias" sharply contrasts with its detailed analysis of the facts that properly determine the outcome of this case.

¶109 Chief Justice Roberts stated in his dissent in Caperton:

> The Court's new "rule" provides no guidance to judges and litigants about when recusal will be constitutionally required. This will inevitably lead to an increase in allegations that judges are biased, however groundless those charges may be. The end result will do far more to erode public confidence in judicial impartiality than an isolated failure to recuse in a particular case.

Id. at 890-91 (Roberts, C.J., dissenting). I share Chief Justice Roberts' concerns about the state of the law as it

12

relates to bias and constitutionally required recusal. Without clarification and guidance, these developments in the law may "do far more to erode public confidence in judicial impartiality" than the occasional misstep by a judge.

¶110 For the foregoing reasons, I respectfully concur.

¶111 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this opinion.

¶112 ANNETTE KINGSLAND ZIEGLER, J.    (concurring).   I agree with the lead opinion's conclusion that Jesse Herrmann has not shown that the sentencing judge, Judge Ramona A. Gonzalez, was objectively biased in violation of due process.   I write to clarify the due process recusal test. Citing cases including Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), the lead opinion states that "[a] defendant may rebut the presumption [that a judge acted fairly, impartially, and without prejudice] by showing that the appearance of bias reveals a great risk of actual bias."   Lead op., ¶3. However, due process requires recusal only if a judge is actually biased or if a "rare" or an "exceptional case" with "extreme facts" creates a "serious risk of actual bias."   Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 883-84, 886-88, 890.

¶113 Caperton concludes that objective proof of actual bias or the probability of a serious risk of actual bias must exist before recusal is required.   Caperton, 556 U.S. at 883-84. Stated otherwise, it is not reasonable to question a judge's impartiality unless one can prove by objective evidence that actual bias or the probability of a serious risk of actual bias exists. See id. at 884.

¶114 The recusal test to be applied is the test explained by the Supreme Court in Caperton, which requires a "rare" or an "exceptional case" with "extreme facts" that create a "serious risk of actual bias."   Caperton, 556 U.S. at 883-84, 886-88, 890.   If the test were only whether an appearance of bias

1

existed, and nothing more extreme or exceptional were required, then this record would support the defendant's contention that Judge Gonzalez should have recused herself. To succeed on a due process claim, much more is required.

¶115 Accordingly, I write to discuss the due process test of Caperton. I note that the Judicial Code[1] and the disqualification statute provide for specific factual circumstances under which a judge must recuse, even when that judge could be completely fair. See, e.g., Supreme Court Rule ("SCR") 60.04(4)(a) to (f); Wis. Stat. § 757.19(2)(a) to (f).[2]

---

[1] "The Code of Judicial Conduct is contained in ch. 60 of the Supreme Court Rules. It was formerly referred to as the Code of Judicial Ethics." State v. Henley, 2011 WI 67, ¶21 n.12, 338 Wis. 2d 610, 802 N.W.2d 175.

[2] The provisions of the disqualification statute and Supreme Court Rule ("SCR") Ch. 60, which identify specific factual circumstances where recusal is required, do not employ an analysis about reasonableness. However, "[t]he Judicial Code provides no authority to the supreme court to disqualify a justice from participating in a particular case when that justice has considered and decided a motion to disqualify him or her." Henley, 338 Wis. 2d 610, ¶23. "[T]his court does not have the power to remove a justice from participating in an individual proceeding, on a case-by-case basis." Id., ¶25. When presented with a disqualification motion, a "justice must decide for himself or herself whether his or her disqualification [is] required." Id., ¶11; see also id., ¶¶13, 26. In addition, the disqualification statute requires recusal "[w]hen a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner." Wis. Stat. § 757.19(2)(g).

> Section 757.19(2)(g), [Wis.] Stats., mandates a judge's disqualification only when that judge makes a determination that, in fact or in appearance, he or she cannot act in an impartial manner. It does not require disqualification in a situation where one other than the judge objectively believes there is an

(continued)

2

*Caperton* makes clear that a judge need not recuse simply because someone claims that the judge is partial. In other words, *Caperton* concludes that a reasonable, well-informed person, knowledgeable about judicial ethical standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know, would reasonably question the judge's ability to be impartial because of actual bias or the probability of a serious risk of actual bias. Such circumstances are exceedingly rare.[3]

¶116 Because we are bound by the Supreme Court precedent in *Caperton* when applying the due process clause of the United States Constitution, it is important to clearly set out the *Caperton* test so that those who consider seeking judicial recusal will be well-informed, as will the judges who decide recusal motions. Further, because "motions to disqualify a justice from participating in a particular case have increased

---

appearance that the judge is unable to act in an impartial manner; neither does it require disqualification . . . in a situation in which the judge's impartiality 'can reasonably be questioned' by someone other than the judge.

*Donohoo v. Action Wisconsin Inc.*, 2008 WI 110, ¶24, 314 Wis. 2d 510, 754 N.W.2d 480 (quoted source omitted) (ellipsis added in *Donohoo*). Because *Donohoo* and *Henley* are controlling precedent, I rely on them in this opinion.

[3] For example, the Judicial Code requires recusal "when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial[.]" SCR 60.04(4) (intro.).

3

dramatically since the United States Supreme Court decided Caperton," State v. Henley, 2011 WI 67, ¶10, 338 Wis. 2d 610, 802 N.W.2d 175, it is important to recognize that Caperton's holding is very limited. Caperton will be discussed in more detail.

## I. DISCUSSION

¶117 "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). "'Due process requires a neutral and detached judge. If the judge evidences a lack of impartiality, whatever its origin or justification, the judge cannot sit in judgment.'" State v. Rochelt, 165 Wis. 2d 373, 378, 477 N.W.2d 659 (Ct. App. 4 1991) (quoting State v. Washington, 83 Wis. 2d 808, 833, 266 N.W.2d 597 (1978)). "The operation of the due process clause in the realm of judicial impartiality, then, is primarily to protect the individual's right to a fair trial." People v. Freeman, 222 P.3d 177, 181 (Cal. 2010). "We presume that judges are impartial," and someone who challenges a judge's impartiality bears a heavy burden to "rebut that presumption." State v. Pinno, 2014 WI 74, ¶103, 356 Wis. 2d 106, 850 N.W.2d 207.

¶118 "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient." Freeman, 222 P.3d at 178. In a due process recusal challenge, "[i]t is not sufficient to show that there is an appearance of bias or that the circumstance might lead one to speculate that the judge is

4

biased." State v. O'Neill, 2003 WI App 73, ¶12, 261 Wis. 2d 534, 663 N.W.2d 292 (citing State v. McBride, 187 Wis. 2d 409, 416, 523 N.W.2d 106 (Ct. App. 1994)).

¶119 "Instead, based on an objective assessment of the circumstances in the particular case, there must exist 'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.'" Freeman, 222 P.3d at 178 (quoting Caperton, 556 U.S. at 877) (quotation marks omitted). In other words, this objective assessment "asks whether objective facts show actual bias." O'Neill, 261 Wis. 2d 534, ¶11 (citing McBride, 187 Wis. 2d at 415-16). "Thus, actual bias——either its presence, or the great risk of it——is the underlying concern of objective bias [due process] analysis." State v. Goodson, 2009 WI App 107, ¶14, 320 Wis. 2d 166, 771 N.W.2d 385. The Supreme Court in Caperton "emphasized that only the most 'extreme facts' would justify judicial disqualification based on the due process clause." Freeman, 222 P.3d at 178 (quoting Caperton, 556 U.S. at 886-89). Accordingly, when a litigant asserts actual bias, he or she must show extreme facts such as those in Caperton. See id.

¶120 "Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes: 'Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.'" Id. (quoting Caperton, 556 U.S. at 890).

5

Wisconsin's Judicial Code and disqualification statute aim to prevent the appearance of bias by requiring recusal in specifically described factual situations even though the judge is actually unbiased.[4] See, e.g., SCR 60.04(4)(a) to (f); Wis. Stat. § 757.19(2)(a) to (f); see also Pinno, 356 Wis. 2d 106, ¶97 (holding that the Judicial Code did not require recusal and noting that the judge had an "appearance of impartiality"); In re Disciplinary Proceedings Against Crosetto, 160 Wis. 2d 581, 583-84, 466 N.W.2d 879 (1991) (holding that the disqualification statute did not require recusal because there was no "appearance of a lack of impartiality"). For example, recusal is required when "[t]he judge of an appellate court previously handled the action or proceeding as judge of another court." SCR 60.04(4)(b); see also Wis. Stat. § 757.19(2)(e) (requiring recusal of "a judge of an appellate court [who] previously handled the action or proceeding while judge of an inferior court"). Specifically defined requirements of recusal in SCR Ch. 60 and the disqualification statute are not at issue in this case because Herrmann's challenge is under the more general notion of reasonableness as it intersects with due process protection.

¶121 Thus, I analyze the circumstances when recusal is sought based on what is sometimes referred to as the "reasonable

_____

[4] These enumerated situations might require recusal although due process does not. See State v. Pinno, 2014 WI 74, ¶94, 356 Wis. 2d 106, 850 N.W.2d 207 ("'[T]he codes of judicial conduct provide more protection than due process requires . . . .'" (quoting Caperton, 556 U.S. at 890)).

person" standard. When such a challenge is made, the burden is to show a "rare" or an "extraordinary situation" with "extreme" facts that create a "serious, objective risk of actual bias," such that it is the limited situation where recusal is required, as was demonstrated under the unique facts of Caperton. See Caperton, 556 U.S. at 886-87, 890. The Supreme Court made clear that it is a "rare instance[]" indeed where a judicial officer is required to recuse when no rule specifies factual circumstances that call for recusal. Id. at 890.

¶122 If due process required a judge to recuse because of an appearance of bias, then what is unreasonable about Herrmann thinking that Judge Gonzalez appeared biased based on her statements such that she must recuse? In 1976 a drunk driver struck a car holding five young women, killing four of them. One of the women who died was Judge Gonzalez's sister. Herrmann drove his truck while intoxicated and rear-ended a car carrying five young women. Herrmann's accident killed one of the young women and seriously injured the other four. During Herrmann's sentencing hearing, Judge Gonzalez stated:

> In 1976 five young women got into a vehicle, and only one of them survived. The two gentlemen in the other vehicle were 17, drunk out of their minds, and they did not survive. That was my personal story, and I will tell you that a day does not go by that I do not think of that personal tragedy, and I wish that I could tell these victims that that pain will one day disappear, but it doesn't.

Judge Gonzalez further stated:

> Perhaps it is again destiny or a higher power . . . that bring[s] me to be the judge on this particular case because I probably more than anyone else who would be able to sit on this bench in this

7

county understand the pain that these victims are feeling, but I have had the benefit of all those years since 1976 to understand that I have to make Mr. Herrmann pay . . . .

¶123 Because a complete understanding of Caperton is so important to understanding a judge's obligations upon being moved to recuse, I now turn to Caperton.

¶124 As the following discussion shows, Caperton's very limited holding does not allow "an attack on virtually any ju[dge] for nearly any reason and [does not] allow litigants to 'pick their court' by filing recusal motions against certain ju[dges] and not others." State v. Allen, 2010 WI 10, ¶260, 322 Wis. 2d 372, 778 N.W.2d 863 (Ziegler, J., concurring). "Such an expansion of Caperton could cause gridlock in the court and delay justice being dispensed. The Supreme Court made clear that it did not intend such consequences." Id. In fact, the Supreme Court noted that "[n]ot every campaign contribution by a litigant or [an] attorney creates a probability of bias that requires a judge's recusal, but this is an exceptional case."[5]

---

[5] Although the Supreme Court in Caperton was discussing due process when it stated that not every campaign contribution requires a judge's recusal, the same principle applies under the Judicial Code. Wisconsin's Judicial Code states that "[a] judge shall not be required to recuse himself or herself in a proceeding based solely on any endorsement or the judge's campaign committee's receipt of a lawful campaign contribution, including a campaign contribution from an individual or entity involved in the proceeding." SCR 60.04(7). As the comment to this rule explains:

Campaign contributions to judicial candidates are a fundamental component of judicial elections. . . .

The purpose of [SCR 60.04(7)] is to make clear that the receipt of a lawful campaign contribution by

(continued)

8

*Caperton*, 556 U.S. at 884. The exceptional circumstances of *Caperton* demonstrated the probability of a serious risk of actual bias that the Court determined that there was a due process violation. The Supreme Court noted that such a violation would indeed be "rare." Id. at 890. A campaign contribution or expenditure alone does not result in a due process violation. Even the large expenditure in *Caperton* was but one of many factors that, collectively, were fundamental to the Court's decision. In *Caperton* the Court did not conclude that, standing alone, a lawful contribution, large expenditure, or other significant support in a campaign would require a judge to recuse.

---

a judicial candidate's campaign committee does not, by itself, require the candidate to recuse himself or herself as a judge from a proceeding involving a contributor. An endorsement of the judge by a lawyer, other individual, or entity also does not, by itself, require a judge's recusal from a proceeding involving the endorser. Not every campaign contribution by a litigant or [an] attorney creates a probability of bias that requires a judge's recusal.

Campaign contributions must be publicly reported. Disqualifying a judge from participating in a proceeding solely because the judge's campaign committee received a lawful contribution would create the impression that receipt of a contribution automatically impairs the judge's integrity. It would have the effect of discouraging "the broadest possible participation in financing campaigns by all citizens of the state" through voluntary contributions, see Wis. Stat. § 11.001, because it would deprive citizens who lawfully contribute to judicial campaigns, whether individually or through an organization, of access to the judges they help elect.

SCR 60.04(7) cmt.

9

¶125 For purposes of clarification, in Wisconsin, a judicial candidate may not even solicit or accept campaign contributions. In other words, it is fundamental that a judicial candidate cannot ask anyone for any campaign money. SCR 60.06(4) ("A judge, candidate for judicial office, or judge-elect shall not personally solicit or accept campaign contributions.").

¶126 In addition, a judicial candidate certainly cannot control whether a third party expends resources in an attempt to affect the outcome of a contested seat. Caperton was decided before Citizens United v. Federal Election Commission, in which the United States Supreme Court struck down as unconstitutional, under the First Amendment, a federal law that prohibited corporations from making independent expenditures for speech that expressly advocates the election or defeat of a candidate. Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 365-66 (2010).

¶127 Thus, even if a judicial candidate were to publicly request that third parties not spend money to support his or her campaign or to discredit an opponent's campaign, the First Amendment entitles third parties to do so anyway. See id. If a campaign contribution or an independent expenditure in a campaign were enough to require recusal, no sensible stopping point would exist. Sometimes people support a judicial candidate by directly contributing to his or her campaign. Sometimes people do not support a judicial candidate and directly contribute to an opponent's campaign. Sometimes third

10

parties exercise their First Amendment rights to either support or discredit a judicial candidate. Should all of these circumstances require recusal? Does one scenario require recusal more than the others, if a "reasonable person" says so?

¶128 The Court in Caperton recognized that the answer to those questions is "no" and that it is a rare and exceptional circumstance wherein much more must be proved before a judge must recuse. Extreme circumstances must converge so as to create the probability of a serious risk of actual bias. Caperton, 556 U.S. at 884. If Caperton were to have required any less, there would be no sensible stopping point for a judge's duty to recuse. "Caperton involved extreme and extraordinary facts which the Supreme Court recognized in its majority opinion no less than a dozen times." Allen, 322 Wis. 2d 372, ¶261 (Ziegler, J., concurring); see also id., ¶263 n.4 (identifying a dozen times where Caperton highlighted that case's extreme and extraordinary facts); State v. Henley, 2011 WI 67, ¶33, 338 Wis. 2d 610, 802 N.W.2d 175 ("[A]s the United States Supreme Court repeatedly said in its decision in Caperton, that decision is based on extraordinary and extreme facts.").

¶129 The "extreme facts" that amounted to a due process violation in Caperton began with a $50 million jury verdict that was entered in favor of Caperton and against A.T. Massey. Caperton, 556 U.S. at 872. "After the verdict but before the appeal, West Virginia held its 2004 judicial elections." Id. at 873. Five justices sit on the West Virginia Supreme Court of

Appeals. Id. at 874-75. Whoever won the West Virginia Supreme Court of Appeals' 2004 election would most certainly be on the court when it decided whether to sustain or overturn this $50 million verdict against A.T. Massey. Id. at 873.

¶130 Donald Blankenship, who was A.T. Massey's chairman, chief executive officer, and president, "[knew] that the Supreme Court of Appeals of West Virginia would consider the appeal in the case." Id. Blankenship spent $3 million to support the election of Brent Benjamin, an attorney who was running against Justice Warren McGraw for a seat on the West Virginia Supreme Court of Appeals. Id. Specifically, Blankenship "contribut[ed] the $1,000 statutory maximum to Benjamin's campaign committee"; Blankenship donated almost $2.5 million to a political organization that supported Benjamin's campaign and opposed Justice McGraw's campaign[6]; and Blankenship additionally spent "just over $500,000 on independent expenditures——for direct mailings and letters soliciting donations as well as television and newspaper advertisements——to support . . . Brent Benjamin." Id. (ellipsis in original) (quotation marks omitted).

¶131 Blankenship's $3 million of expenditures supporting the election of Benjamin, who if elected would be on the West

---

[6] Blankenship's $2.5 million donation to this political organization accounted for more than two-thirds of the funds raised by this organization during this election. Caperton v. A.T. Massey Coal Co., 679 S.E.2d 223, 304 (W. Va. 2008) (Benjamin, Acting C.J., concurring), rev'd and remanded, 556 U.S. 868 (2009) ("Mr. Blankenship personally contributed $2,460,500 [to this organization]. The remaining contributions, totaling $1,163,000, were given by other individuals and organizations.").

12

Virginia Supreme Court of Appeals when it decided the pending case involving Blankenship's company, dwarfed all other spending in the election. In particular, Blankenship's $3 million of expenditures supporting Benjamin were "more than the total amount spent by all other Benjamin supporters and three times the amount spent by Benjamin's own committee." Id. "Caperton contend[ed] that Blankenship spent $1 million more than the total amount spent by the campaign committees of both candidates combined." Id. In short, Blankenship spent $3 million in support of Benjamin, all of Benjamin's other supporters collectively spent less than $3 million on independent expenditures in support of Benjamin, Benjamin's campaign committee spent $828,663,[7] and Justice McGraw's campaign committee spent $1,313,861.[8] See id.

¶132 In addition, the United States Supreme Court noted that the election results were not a landslide victory. Id. A total of 716,337 people voted in the West Virginia Supreme Court of Appeals race. See id. Benjamin was elected with a narrow margin of 53.3% of the votes. Id. Benjamin defeated his opponent by fewer than 50,000 votes (Benjamin received 382,036 votes and Justice McGraw received 334,301). Id.

---

[7] Justice Benjamin's relevant campaign finance filing is available at http://apps.sos.wv.gov/elections/candidate-search/readpdf.aspx?DocId=5595.

[8] Justice McGraw's relevant campaign finance filing is available at http://apps.sos.wv.gov/elections/candidate-search/readpdf.aspx?DocId=5627.

13

¶133 Approximately 11 months after Justice Benjamin won the election, and shortly before A.T. Massey filed its petition for appeal, Caperton moved to disqualify Justice Benjamin in the particular case that was pending the entire election between A.T. Massey and Caperton. Id. at 873-74. Caperton argued that the due process clause required Justice Benjamin's recusal "based on the conflict caused by Blankenship's campaign involvement." Id. at 874. Justice Benjamin denied the recusal motion. Id. The West Virginia Supreme Court of Appeals, by a 3-to-2 vote, reversed the $50 million verdict against A.T. Massey. Id. Justice Benjamin joined the majority opinion. Id.

¶134 "Caperton sought rehearing, and the parties moved for disqualification of three of the five justices who decided the appeal." Id. In particular, Caperton again moved to disqualify Justice Benjamin. Id. at 875. Justice Benjamin denied the motion. Id. Justice Elliot Maynard, who joined the three-justice majority opinion, granted Caperton's recusal motion because "[p]hotos had surfaced of Justice Maynard vacationing with Blankenship in the French Riviera while the case was pending." Id. at 874. Justice Larry Starcher, one of the two dissenting justices, "granted [A.T.] Massey's recusal motion, apparently based on his public criticism of Blankenship's role in the 2004 elections." Id. at 874-75. The West Virginia Supreme Court of Appeals subsequently granted rehearing. Id. at 875. Justice Benjamin, then serving as acting chief justice, selected two West Virginia circuit judges to replace the two recused justices on the case between Caperton and A.T. Massey.

14

Id. Accordingly, unlike a justice in Wisconsin, Justice Benjamin could have been replaced had he recused himself. See id. at 874-75. The West Virginia Supreme Court of Appeals again voted 3-to-2 to reverse the $50 million verdict against A.T. Massey. Id. at 875. Justice Benjamin again joined the majority. Id. Caperton petitioned the United States Supreme Court to review Justice Benjamin's denial of its recusal motions.

¶135 The United States Supreme Court granted certiorari to determine "whether the Due Process Clause of the Fourteenth Amendment was violated when [Justice Benjamin] denied a recusal motion." Id. at 872. The Supreme Court determined "that, in all the circumstances of [that] case, due process require[d] recusal." Id.

¶136 The United States Supreme Court concluded that there was a serious risk of Justice Benjamin's actual bias in sitting on Caperton because: (1) the case had been pending since before Justice Benjamin was elected; (2) the jury verdict in that case was $50 million; (3) if elected, Justice Benjamin would be sitting on the court that would review this $50 million verdict; (4) Blankenship's extraordinary $3 million expenditures supporting Benjamin dwarfed the amount spent by both campaign committees combined; (5) Blankenship's $3 million expenditures exceeded the expenditures of all other Benjamin supporters combined; and (6) Blankenship's $3 million expenditures had a "significant and disproportionate influence" in helping Benjamin win a close election. See Caperton, 556 U.S. at 883-86. The

15

Supreme Court emphasized that "[t]he temporal relationship between the campaign contributions, the justice's election, and the pendency of the case [was] also critical." Id. at 886.

¶137 The Supreme Court made clear that no one factor alone——or anything short of this combination of factors——would have constituted a due process violation so to require recusal. In that regard, the Supreme Court noted that its holding was based on "all the circumstances of [that] case . . . ." Id. at 872. The Court further noted that "[a]pplication of the constitutional standard implicated in [Caperton] will [] be confined to rare instances." Id. at 890.

¶138 "[N]owhere in the Caperton decision does the Supreme Court state that any lesser fact situation would have required Justice Benjamin's recusal in that case, and nowhere does the Supreme Court conclude that he would be required to recuse himself from an unrelated civil case that involved different parties." Allen, 322 Wis. 2d 372, ¶269 (Ziegler, J., concurring). "To suggest that Caperton says otherwise is to invent new law and to invite recusal motions based upon 'spin' instead of whether a justice can be fair and impartial. Such practice is destructive to the credibility of the court, as justices are always presumed to be fair and impartial." Id. "To be clear, nowhere in Caperton does the majority state that anything less than this 'perfect storm,' created by those extreme and extraordinary facts coupled with the timing of the election and the parties' pending case, would be sufficient to constitute a due process violation." Id.

16

¶139 In short, the Supreme Court in Caperton expressly recognized that its holding was limited by the rare nucleus of facts presented in that case. The Court, when considering the objective test, which Wisconsin adopted in State v. Asfoor, 75 Wis. 2d 411, 436, 249 N.W.2d 529 (1977),[9] stated:

> We conclude that there is a serious risk of actual bias——based on objective and reasonable perceptions—— when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.

Caperton, 556 U.S. at 884. In other words, it was not the $3 million dollar expenditure alone that required recusal. Id. at 883-86. Accordingly, the due process test for judicial recusal set forth in Caperton was met because those extraordinary and extreme facts converged in a pending case where one person's contributions had a "significant and disproportionate influence" on a close election. See id.; see also Allen, 322 Wis. 2d 372, ¶¶261-262, 269, 271 (Ziegler, J., concurring) (recognizing the limits of Caperton); Henley, 338 Wis. 2d 610, ¶¶32-33 (same).

¶140 In accord with Caperton, the "reasonable person" recusal standard is controlled by the objective due process recusal test explained in Caperton. Indeed, more than 30 years ago this court defined the Judicial Code's reasonable person recusal standard as synonymous with the objective due process

---

[9] See State v. Walberg, 109 Wis. 2d 96, 105-06, 325 N.W.2d 687 (1982) (recognizing that Asfoor adopted this due process recusal test).

recusal test. See State v. Walberg, 109 Wis. 2d 96, 105-06, 325 N.W.2d 687 (1982) (applying the reasonable person standard from the Judicial Code to determine whether a judge's failure to recuse himself violated the objective due process recusal test). That test has been further explained by Caperton wherein the Supreme Court cautioned that the objective due process test requires recusal only in an "exceptional case" with "extreme facts" that create a "serious risk" of actual bias. See Caperton, 556 U.S. at 884, 886-88; see also Freeman, 222 P.3d at 184 (citing Caperton, 556 U.S. at 889-90).

¶141 If a judge were required to recuse whenever a person could conjure a reason to question a judge's impartiality, a judge could be attacked without a standard on which to evaluate the attack. We have rejected a loose and standardless test, as the Supreme Court in Caperton did, in no small part because it would invite mischief and judge shopping.[10] See Henley, 338 Wis. 2d 610, ¶35; Allen, 322 Wis. 2d 372, ¶¶260-262 (Ziegler, J., concurring); Donohoo v. Action Wisconsin Inc., 2008 WI 110, ¶¶29-30, 314 Wis. 2d 510, 754 N.W.2d 480. As demonstrated by our conclusion that recusal was not required in Donohoo, Henley, Pinno, and similar cases,[11] the recusal standard is the one set

---

[10] A circuit court or court of appeals judge who recuses himself or herself may get replaced by a substitution judge. See Wis. Stat. §§ 757.19(5), 751.03. A circuit court or court of appeals judge may be replaced by a reserve judge. § 751.03(1). However, a supreme court justice who recuses himself or herself from a case cannot be replaced. See id.

[11] See Henley, 338 Wis. 2d 610, ¶¶11-17 (collecting cases).

18

forth in Caperton, which requires the challenger to demonstrate by objective proof that actual bias or the probability of a serious risk of actual bias exists. See Caperton, 556 U.S. at 883-84, 886-87.

¶142 When a recusal motion is brought, the movant bears a burden "to overcome the presumption of impartiality." Pinno, 356 Wis. 2d 106, ¶97. Interpreting the reasonable person standard more broadly than Caperton's due process recusal test would turn the movant's burden of proof on its head. The objective due process recusal test asks whether there are "extreme facts" in an "exceptional case" where, "based on objective and reasonable perceptions," "there is a serious risk of actual bias." Caperton, 556 U.S. at 884, 886-88.

¶143 In Pinno, a consolidated opinion, one of the defendants, Travis Seaton, was convicted of first-degree reckless homicide as a repeater. Id., ¶11. He filed a post-conviction motion in which he argued "that his sentence was too harsh, reasserted his argument that one of the jurors was biased, and argued that 'other acts evidence' was used improperly." Id., ¶18. The circuit court, Judge Richard J. Nuss presiding, who also presided over the trial, denied the motion. Id., ¶¶2, 18. The court of appeals affirmed. Id., ¶18. Seaton then filed another post-conviction motion, in which he "argued for the first time that his Sixth Amendment right to a public trial was violated. In the alternative, Seaton argued that his counsel was ineffective for failing to object to the closure of the courtroom." Id., ¶19. Seaton also filed a

19

motion requesting that Judge Nuss recuse himself from ruling on the post-conviction motion. Id., ¶22. Judge Nuss denied the recusal motion and post-conviction motion. Id., ¶24.

¶144 On appeal, we held that "Judge Nuss properly denied Seaton's recusal motion." Id., ¶97. First, Seaton argued that the judicial disqualification statute, Wis. Stat. § 757.19(2), required Judge Nuss's recusal. See id., ¶93. Because no specifically described factual circumstance set out in Wis. Stat. § 757.19(2)(a) to (f) was applicable, we concluded that "[t]he relevant recusal standard in the Wisconsin Statutes is a subjective one," namely § 757.19(2)(g). See id. We had to determine "objectively whether [Judge Nuss] actually made the subjective determination" that he could remain on the case. Id. We concluded that "Judge Nuss determined that he was not biased; therefore, he complied with § 757.19(2)(g)."[12] Id.

¶145 Next, we examined Ch. 60 of the Supreme Court Rules ("SCR")——Wisconsin's Judicial Code——to analyze Seaton's recusal claim. Id., ¶¶95-96. We concluded that SCR Ch. 60 did not

---

[12] In addition to satisfying Wis. Stat. § 757.19(2)(g), a judge also satisfies the subjective due process recusal test by determining that he or she is impartial. State v. McBride, 187 Wis. 2d 409, 415-16, 523 N.W.2d 106 (Ct. App. 1994) (citing State v. Rochelt, 165 Wis. 2d 373, 378-79, 477 N.W.2d 659 (Ct. App. 1991)); see also Caperton, 556 U.S. at 882 ("We do not question [Justice Benjamin's] subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias."). In other words, if a judge determines that he or she is impartial, that determination is difficult to overcome.

require recusal because "[n]one of SCR 60.04(4)'s enumerated circumstances fits the facts" presented. Id., ¶96.

¶146 We also concluded that the due process test from Caperton did not require Judge Nuss's recusal. Id., ¶94. We reasoned that "Judge Nuss's conduct does not approach the extreme circumstances that violate due process." Id. In other words, the defendant-movant did not demonstrate a Caperton-type extraordinary circumstance with extreme facts that created a strong risk of actual bias. In short, we held that Judge Nuss properly denied the recusal motion because (1) he determined that he was not biased; (2) his situation did not match any of the specific situations enumerated in Wis. Stat. § 757.19(2) or SCR 60.04(4); and (3) there were no "extreme circumstances that violate[d] due process" as there were in Caperton.[13] See id., ¶¶93-97.

¶147 In the present case, Judge Gonzalez expressly determined that she could be impartial, and it is undisputed that none of the specific situations enumerated in SCR Ch. 60 or Wis. Stat. § 757.19(2)(a) to (f) are applicable. Accordingly, in order for Judge Gonzalez to have been required to recuse, Herrmann would have had to prove actual bias or the probability of a serious risk of actual bias, as explained in Caperton. See

---

[13] In Pinno we noted the reasonable person recusal standard in SCR 60.04(4)(intro.). State v. Pinno, 2014 WI 74, ¶96, 356 Wis. 2d 106, 850 N.W.2d 207. We did not separately analyze whether that standard required Judge Nuss's recusal, apparently because we recognized that it is coextensive with the objective due process test from Caperton. See id., ¶¶94-97.

21

also id., ¶¶92-97; Henley, 338 Wis. 2d 610, ¶¶10-17, 32-35; Allen, 322 Wis. 2d 372, ¶¶260-264 (Ziegler, J., concurring); Donohoo, 314 Wis. 2d 510, ¶¶19-28.

¶148 In light of Caperton, the Wisconsin Court of Appeals' application of the due process test in Goodson and Gudgeon is called into question. Caperton undermines the validity of Goodson and Gudgeon and at the very least it tailors those cases to the conflict therein which may be otherwise prohibited even if not a due process violation.[14] The United States Supreme Court in Caperton has further refined the Goodson and Gudgeon analysis such that we now must review whether recusal is required due to extreme and exceptional circumstances as were present in Caperton, and we now know that such circumstances will rarely be demonstrable. See Caperton, 556 U.S. at 887, 890.

¶149 In line with our reasoning today, the California Supreme Court recently explained in a unanimous opinion how

---

[14] In Gudgeon the court of appeals held that due process was violated because the circuit court prejudged the issue of whether to extend the defendant's probation. State v. Gudgeon, 2006 WI App 143, ¶¶25-26, 295 Wis. 2d 189, 720 N.W.2d 114. Likewise, in Goodson the court of appeals held that due process was violated because the circuit court prejudged the reconfinement sentence that it would give to the defendant if his probation or extended supervision were revoked. State v. Goodson, 2009 WI App 107, ¶1, 320 Wis. 2d 166, 771 N.W.2d 385. Even if Caperton abrogated Gudgeon and Goodson, prejudgment can require recusal. See SCR 60.04(4)(f) (requiring recusal if a "judge, while a judge or a candidate for judicial office, has made a public statement that commits, or appears to commit, the judge with respect to any of the following: 1. An issue in the proceeding. 2. The controversy in the proceeding").

Caperton's "application is limited" to its probability of actual bias and that due process does not require recusal for a "mere appearance" of impropriety. Freeman, 222 P.3d at 178, 184. I agree. Mere appearance of bias cannot meet the high standard set forth in Caperton. The California Supreme Court reasoned that the United States Supreme Court in Caperton "made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found." Id. at 184 (citing Caperton, 556 U.S. at 889-90).

¶150 In Freeman the defendant appeared before Judge Robert O'Neill for a pre-trial hearing in which she sought new counsel. Id. at 179. At the hearing, the defendant informed Judge O'Neill of "rumors" that the defendant was stalking Judge Elias, a colleague and long-time friend of Judge O'Neill. Id. Judge O'Neill stated that Judge Elias "is a friend of mine" and therefore recused himself from the defendant's case. Id. After the stalking rumors proved unfounded, the defendant's case was reassigned to Judge O'Neill. Id. at 180. Judge O'Neill then presided over the defendant's trial, the defendant was convicted, and Judge O'Neill sentenced her.[15] Id. The defendant

---

[15] We recently held that a circuit court judge, who had been properly substituted out of a case pursuant to Wis. Stat. § 971.20, "erred" in returning to the defendant's case to "presid[e] over the defendant's trial, sentencing, and postconviction motions." State v. Harrison, 2015 WI 5, ¶8, 360 Wis. 2d 246, 858 N.W.2d 372.

23

appealed, and "[t]he Court of Appeal reversed defendant's conviction on the ground that defendant's due process rights were violated by Judge O'Neill's failure to disqualify himself when the case was reassigned to him." Id.

¶151 On review, the California Supreme Court reversed the court of appeal's decision, holding that "this case does not present the 'extreme facts' that require judicial disqualification on due process grounds." Id. at 179. The California Supreme Court noted that it granted review "to determine whether the appearance of bias by a judge requires recusal under the due process clause of the federal Constitution." Id. at 178. It held that "while a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient." Id. "Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes[.]" Id. "Less extreme cases——including those that involve the mere appearance, but not the probability, of bias——should be resolved under more expansive disqualification statutes and codes of judicial conduct." Id. at 185 (citing Caperton, 556 U.S. at 889-90).[16]

_____

[16] In Caperton the Supreme Court noted that "the codes of judicial conduct provide more protection than due process requires . . . ." Caperton, 556 U.S. at 890. The Court reasoned that "States have implemented [judicial reforms] to eliminate even the appearance of partiality." Id. at 888. As noted elsewhere in this opinion, SCR Ch. 60 aims to prohibit the appearance of impartiality and articulates specific, defined standards for recusal by listing specific instances where recusal is required even if a judge actually would be impartial. See, e.g., SCR 60.04(4)(a) to (f); Pinno, 356 Wis. 2d 106, ¶¶95-

(continued)

24

¶152 The California Supreme Court explained that the defendant could have sought recusal under California's disqualification statute because "an explicit ground for judicial disqualification in California's statutory scheme is a public perception of partiality, that is, the appearance of bias." Id. at 181 (citations omitted). "By contrast, the United State Supreme Court's due process case law focuses on actual bias. This does not mean that actual bias must be proven to establish a due process violation." Id. "Rather, consistent with its concern that due process guarantees an impartial adjudicator, the [United States Supreme Court] has focused on those circumstances where, even if actual bias is not demonstrated, the probability of bias on the part of a judge is so great as to become 'constitutionally intolerable.'" Id. at 181-82 (quoting Caperton, 556 U.S. at 882) (quotation marks omitted). Although Judge O'Neill was a friend of an alleged victim of the defendant's stalking, "[t]his case does not implicate any of the concerns——pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions——which were the factual bases for the United States Supreme Court's decisions in which it found that due process required judicial disqualification." Id. at 185.

---

97. However, under Wisconsin's Judicial Code, "[a] judge shall not be required to recuse himself or herself in a proceeding based solely on . . . the judge's campaign committee's receipt of a lawful campaign contribution, including a campaign contribution from an individual or entity involved in the proceeding." SCR 60.04(7).

25

While it is true that dicta in these decisions may foreshadow other, as yet unknown, circumstances that might amount to a due process violation, that dicta is bounded by repeated admonitions that finding such a violation in this sphere is extraordinary; the [due process] clause operates only as a 'fail-safe' and only in the context of extreme facts.

Id.

¶153 A judge should recuse when required to do so and should not recuse when recusal is not required. Wisconsin Supreme Court justices need to be particularly mindful of when they must recuse and when recusal is not required. Unlike Justice Benjamin in Caperton, Judge O'Neill in Freeman, a Wisconsin Circuit Court judge, or a Wisconsin Court of Appeals judge, a Wisconsin Supreme Court justice who recuses cannot be replaced. Thus, recusal has far-reaching consequences and leaves the citizens of the state without full supreme court consideration in a case of statewide significance.

¶154 Complications that may occur when a full supreme court does not consider a case are self-evident. Citizens of the state deserve to have the entire supreme court decide all cases unless extreme circumstances require otherwise. Unlike a circuit court or the court of appeals, the supreme court serves a law development purpose; therefore, cases before the supreme court impact more than parties then before the court. The Rule of Necessity, which requires that justices sit on a case if "necessary," further demonstrates the heightened need for justices to remain on a case even when the path of least

26

resistance may be to recuse.[17] The decision to recuse cannot be made lightly or out of fear of reprisal.

¶155 Thus, Wisconsin Supreme Court justices may weigh and balance the need for recusal somewhat differently than a trial court or intermediate appellate court judge. As a comment in Wisconsin's Judicial Code aptly explains:

> Involuntary recusal of judges has greater policy implications in the supreme court than in the circuit court and court of appeals. Litigants have a broad right to substitution of a judge in circuit court. When a judge withdraws following the filing of a substitution request, a new judge will be assigned. When a judge on the court of appeals withdraws from a case, a new judge also is assigned. When a justice of the supreme court withdraws from a case, however, the justice is not replaced. Thus, the recusal of a supreme court justice alters the number of justices reviewing a case as well as the composition of the court. These recusals affect the interests of non-litigants as well as non-contributors, inasmuch as supreme court decisions almost invariably have repercussions beyond the parties.

SCR 60.04(7) cmt.

¶156 Similarly, Chief Justice John G. Roberts has explained that justices on the United States Supreme Court should be more

---

[17] "By decisional law, the rule of necessity may override the rule of recusal." SCR 60.04(4) cmt; see also State ex rel. Wickham v. Nygaard, 159 Wis. 396, 150 N.W. 513 (1915); State ex rel. Cook v. Houser, 122 Wis. 534, 100 N.W. 964 (1904). The rule of necessity is not without limitation. For example, "application of the common law Rule of Necessity should not result in the defendant, potential defendant, and the witnesses also sitting in final judgment of the case." In re Judicial Disciplinary Proceedings Against Prosser, 2012 WI 103, ¶5, 343 Wis. 2d 548, 817 N.W.2d 875 (opinion of Ziegler, J.).

hesitant to grant recusal motions than federal district and federal circuit court judges:

> Although a Justice's process for considering recusal is similar to that of the lower court judges, the Justice must consider an important factor that is not present in the lower courts. Lower court judges can freely substitute for one another. If an appeals court or [a federal] district court judge withdraws from a case, there is another federal judge who can serve in that recused judge's place. But the Supreme Court consists of nine Members who always sit together, and if a Justice withdraws from a case, the Court must sit without its full membership. <u>A Justice accordingly cannot withdraw from a case as a matter of convenience or simply to avoid controversy. Rather, each Justice has an obligation to the Court to be sure of the need to recuse before deciding to withdraw from a case</u>.

John G. Roberts, Chief Justice, U.S. Supreme Court, 2011 Year-End Report on the Federal Judiciary, at 9 (Dec. 31, 2011) (emphasis added), <u>available at</u> http://www.supremecourt.gov/publicinfo/year-end/2011year-endreport.pdf.

## II. CONCLUSION

¶157 I agree with the lead opinion's conclusion that Jesse Herrmann has not shown that the sentencing judge, Judge Ramona A. Gonzalez, was objectively biased in violation of due process. I write to clarify the due process recusal test. Citing cases including <u>Caperton</u>, 556 U.S. 868, the lead opinion states that "[a] defendant may rebut the presumption [that a judge acted fairly, impartially, and without prejudice] by showing that the appearance of bias reveals a great risk of actual bias." Lead op., ¶3. However, due process requires recusal only if a judge is actually biased or if a "rare" or an "exceptional case" with

28

"extreme facts" creates a "serious risk of actual bias." Caperton, 556 U.S. at 883-84, 886-88, 890.

¶158 Caperton concludes that objective proof of actual bias or the probability of a serious risk of actual bias must exist before recusal is required. Caperton, 556 U.S. at 883-84. Stated otherwise, it is not reasonable to question a judge's impartiality unless one can prove by objective evidence that actual bias or the probability of a serious risk of actual bias exists. See id. at 884.

¶159 The recusal test to be applied is the test explained by the Supreme Court in Caperton, which requires a "rare" or an "exceptional case" with "extreme facts" that create a "serious risk of actual bias." Caperton, 556 U.S. at 883-84, 886-88, 890. If the test were only whether an appearance of bias existed, and nothing more extreme or exceptional were required, then this record would support the defendant's contention that Judge Gonzalez should have recused herself. To succeed on a due process claim, much more is required.

¶160 Accordingly, I write to discuss the due process test of Caperton. I note that the Judicial Code and the disqualification statute provide for specific factual circumstances under which a judge must recuse, even when that judge could be completely fair. See, e.g., SCR 60.04(4)(a) to (f); Wis. Stat. § 757.19(2)(a) to (f). Caperton makes clear that a judge need not recuse simply because someone claims that the judge is partial. In other words, Caperton concludes that a reasonable, well-informed person, knowledgeable about judicial

29

ethical standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know, would reasonably question the judge's ability to be impartial because of actual bias or the probability of a serious risk of actual bias. Such circumstances are exceedingly rare.

¶161 For the foregoing reasons, I respectfully concur.

¶162 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice MICHAEL J. GABLEMAN join this concurrence.